Okay, before I begin, obviously, you can all see that Justice Wright is not present today. She is at a meeting, judicial conference meeting this afternoon. She will be fully participating in the decision. She is here with us in spirit, so to speak, but she has obviously read the briefs and has been prepared and will participate. With that, Ms. Ware, you may proceed. Thank you. May I please report? Counsel, my name is Jessica Ware on behalf of the Office of the State Appellate Defender, and I represent the appellant, Ms. Jamie Lomeli. I'd like to reserve a few minutes for rebuttal. Today, I'd like to argue both issues from my brief, beginning with the sufficiency of the evidence argument. Your Honors, our courts have long held that accomplice testimony is fraught with serious weaknesses, such that it should only be accepted with the utmost caution and suspicion. In the incident case, Jamie Lomeli was convicted of first-degree murder on the word of two self-interested accomplices whose testimony was unworthy of belief. Joshua Ward and Sylvia Enriquez had tremendous motive to lie. Both of them were receiving deals from the state. Joshua was facing a de facto life sentence in prison if he did not testify against Jamie Lomeli. He was charged with first-degree murder and home invasion, and both of those counts would have ran consecutively for a total of up to 90 years. But by testifying against Lomeli, he would serve as little as 15 years in prison. Same thing for Sylvia. Sylvia wasn't even charged with murder. By testifying against Lomeli, she was convicted of obstruction of justice. And by even the state's evidence, she could have been charged with this murder. Because Joshua says she's the one who takes the knife out of the victim's hand during the fight and gives it to Louis, who cuts the victim's head. Sylvia avoids murder charges altogether by this deal to testify against Lomeli. And she serves three years in prison on an obstruction of justice charge and is out of prison by the time of Lomeli's trial. And so both of these tremendous deals were hanging in the balance at the time that both of these accomplices testified against Lomeli. So it's no surprise that they were so eager to supply the state's elements of the case. Also, both of these accomplices, not only were they receiving tremendous deals, but they both had a demonstrated history of dishonesty to begin with. Both had been convicted of crimes of dishonesty and crimes of violence for Joshua. Joshua had a burglary, a residential burglary, obstruction of justice, mob action, aggravated battery, criminal trespass. I mean, he's a career criminal. He's had a demonstrated history of crimes of dishonesty and violence. And Sylvia also had a prior conviction for retail theft, which is a conviction of dishonesty. So these people are already dishonest characters with this motive to testify falsely. And their testimony was further weakened by the inconsistencies between their accounts of the incident as to very critical points of the case. For instance, Joshua testified that when the group agreed on this plan to rob the victim, that the defendant was in the room and she agreed. And she said, yes, the victim always has stacks, which means he always has money. He'd be a good target for the robbery. Whereas Sylvia says the opposite. Sylvia says Lomeli wasn't even in the room at the time that this plan was hatched. She was in the living room. And Louis had to send Joshua to go and try to persuade her. But Joshua says that never happened. Louis didn't send me out to get her. She was already in the room. And so their testimony is inconsistent to these very critical facts, which shows that somebody is lying. Somebody's testimony is untrue. It can't be both. Either she was there or she wasn't. And this is not like a minor inconsistency where one witness says, oh, I thought the assailant was 5'7", and the other one says I think he was 5'9". No, this goes to the crux of the case. You know, this goes to their overall credibility. Also, Joshua testified that he took the cocaine from the victim when the victim arrived and gave it to Lomeli, who took it to the bedroom. Sylvia testified that she was with Lomeli when they went to the bedroom. And she doesn't testify anything about her taking the cocaine or anything like that. Another thing that weakens their testimony is Sylvia's testimony was impeached by prior inconsistent statements. She flat out admitted at trial, yes, I lied to the detectives. She says that, well, she testified at trial that Joshua didn't participate at all in this beating. But she told detectives that he did when she was interviewed by detectives. But at trial she said, oh, well, I lied. And another fact, she said that she never grabbed the knife out of the victim's hand during the fight. But she admits, oh, I lied. I told the detectives that I did. That I did take his knife and give it to Louis. And so all these things just show that the accomplice testimony was just unworthy of belief. It was so impeached. They had such a great motive to testify falsely. And so what the state tried to do is they offered Lomeli's text messages as evidence to corroborate Joshua and Sylvia's testimony that Lomeli was involved in this plan to rob. But when you look at the text messages, they actually undermine the state's case entirely. For instance, Joshua and Sylvia both testified that as soon as this plan to rob the victim was hatched, Lomeli immediately gets on her phone and starts text messaging the victim to try to get him to come over to the house. The state argues this before the jury. This is the theory they're going with. This is what the two accomplices say. This is what they're going with. When you look at the actual text messages themselves, and this is independent evidence, these text messages themselves show that the victim initiated this text message conversation. Not the other way around, the way that the state portrayed it to the jury. The victim is the one who reaches out to Lomeli and asks her, how did you like the cocaine? And then the conversation starts from there. And also Joshua and Sylvia also, they testified that Lomeli was on a mission to try to get the victim over to the house. That she was trying to lure him, and Joshua uses those words, that she was on a mission to get him over to the house. But when you look at the messages, Lomeli doesn't appear that invested at all. I mean, at one point in the texting, she says, if you can't come, it's okay, it's good. And then later in the text messages, at one point she says, it's getting too late for this. So it's like, she's giving him every opportunity to not come, but these messages undermine the state's theory that she was on a mission to get him to come over. She seems resigned to the fact that maybe, you know, maybe the drug deal won't happen that night. Also, another aspect of these text messages that completely undermine the state's case is the fact that a substantial amount of these text messages are of Lomeli trying to negotiate a low price for this cocaine. Something that would be totally unnecessary if she's just trying to get him to come over. She's just trying to lure him over for this robbery. Hey, if that's the case, then she can offer him whatever he wants to pay. But no, they're going back and forth for over 15 minutes, 10 texts going back and forth of her haggling over the price of the cocaine. Now, if anything, that would have jeopardized the drug deal. Not, you know, guaranteed that he was going to come over. At any point in time, he could have said, you know what, forget it. You know, you don't want to pay what I'm asking, I'm not selling. So you're saying her intent was to secure drugs, correct? Right. She was intending to do the drug deal. Okay, but what was she charged with? She was charged with murder. Through a theory of? Felony murder and accountability. The state argued that she was accountable for the murder that Lewis and Jason. Lewis and Jason are the people who actually. Correct. What are the elements of the accountability? Well, she has to show that she formed an intent to promote or facilitate the robbery. You know, and there has to be some kind of participation. And so the state used these text messages to show that she had the intent to participate in the robbery. But the text messages don't show that at all. The text messages don't show that she's trying to get him over for a robbery. So it has to be robbery, not purchasing of illicit drugs. Right. Right. The state charged this as felony murder. That she was accountable for the acts that Lewis and Jason committed during the robbery. Also, the state at trial, they argued that perhaps Lomeli was negotiating the price of the cocaine to keep Hunter from being suspicious of her. But that argument is unpersuasive because the evidence showed that Lomeli and Hunter were very close friends. I mean, in fact, Joshua admitted, yeah, they appeared to be close friends. You know, he says that the victim walked in her house two times unannounced without knocking. He just walked right in. And that was the kind of relationship that they had. They were obviously very comfortable with each other. And it's not like he would have any reason to be suspicious of her. I mean, you know, if he's able to walk into her house without knocking, these two people are very comfortable with each other. And so that's the state's own evidence, you know, that's undermining that argument. And if we look at the only objective eyewitness at trial, which is Janelle D. Bernardi. She's the only objective eyewitness. Her testimony actually shows that the defendant was helping the victim. The defendant, after everybody left, after everybody left him bleeding and all that, the defendant is the one who comes out and tells her, you know, we've got to get him to the hospital. You know, she wraps his head up to stop the bleeding. She goes and gets some water. She tries to carry him out to the car. She moves her car out of the driveway so that they can get the car closer to the doorway. And she's taking all of these steps that kind of undermine the state's case. I mean, this is circumstantial evidence of what her intent is, what her mindset is. This is her friend. This is somebody who she's close with. She has no intent to harm him or to rob him or to do anything else. And even if you look at her reaction during the fight, you know, Joshua says that during the fight she tells him, get these two F-U-C-Ks out of my house, meaning Jason and Louis. And then Sylvia says that she tells her, get your boyfriend and get out of my house. And so Lomeli is irate. She's the outlier character here. She's the only one who's upset. She's the only one kicking people out of the house. She's the only one trying to help the victim when they've all left, wrapping his head up and doing all this. And all these things are just circumstantial evidence of her intent, that she had no intent to harm or to rob or to anything. This is actually her friend. Your Honors, the state argues that evidence of Lomeli's intent to rob can be seen from the fact that she lied to police and that she deleted her text messages. But because Lomeli was involved in the drug deal, she would have had a motive to do that anyway. She would have had a motive to cover up her involvement in the drug deal. So that fact cuts both ways. I mean, it supports the defense theory and the state's theory. It's not something that supports the state's theory per se, you know, exclusively. Because if you look at Janelle and Hunter, now these are two people who are totally innocent of the robbery and the murder. Janelle and Hunter did the very same thing. Janelle testified, I lied to police because I didn't want them to find out about this drug deal, and I didn't want Hunter to get in trouble for this drug deal. And she says, Janelle also testifies that Hunter told her not to call the police. And this is while he's beaten up and bleeding out. He says, don't call the police. So everybody's trying to cover up this drug deal. And Lomeli had that motive as well. So the fact that she deleted those texts and the fact that she didn't call police supports the defense's theory that she's involved in this drug deal and she didn't want police to find out about that. Your Honor, the evidence shows that Lomeli was not involved in the robbery. She's simply being used as a pawn to get Hunter to the house. These men knew that they could use her, manipulate her. They were used to doing that. Joshua admitted he used her for sex. Jason was using her to have a place to stay. He had just got out of prison. He was living at her house with her three kids, one of which had Down syndrome. And Joshua was living there too. Everybody was using her. And that's exactly what happened on this day when she was used to lure Hunter to her house for this robbery. And I'd just like to hit my second argument, if that's OK. Is that OK? Your Honor, if this court doesn't vacate the defendant's conviction pursuant to the first argument, then it should remand it for a new trial because the trial court erred in failing to properly admonish the veneer, sorry, about Rule 431B. Failed to properly ask them if they understood and accepted the principles in the Supreme Court rule. Now, the case that I cited in the motion to cite additional authority, people v. Sebi settled this issue, that the question that the trial court asked in this case is error. And Sebi is on appeal right now on defendant's PLA to the Supreme Court. So it's currently pending the Supreme Court. But in Sebi, what happened is exactly what happened in this case. The judge asked the jurors, will the judge explain the principles in Rule 431B and then said, do you have any problems with these principles? And Sebi says that is error. The state conceded in Sebi. I'm not sure why they didn't concede it in this case. But that case says that that question is not able to ascertain whether the jurors can understand. It only is able to determine whether or not they accept it. You know, like if I were to say, let's meet at 4 o'clock, do you have any problem with that? The common understanding is, do you agree or disagree? The common understanding is not, do you understand my question? And that's what Sebi holds. So we've asked that this case find that there was error and also that the evidence was closely balanced for the same reasons that I argued that the evidence was insufficient. Because the accomplices had a tremendous motive to lie. Because they were impeached. Because their testimony was inconsistent. Because the text messages support the defense's case. Because the only objective eyewitness, Janelle DiBernardi, her testimony supports the defense's case as well. So we've asked that you find that the evidence is at least closely balanced for the plain error rule for the second argument. Thank you. Ms. Berger, you have five minutes in reply. Mr. Knitterberg? May it please the court, counsel. The defendant was charged as an accomplice with felony murder based on robbery. With respect to the accountability, you have to show that the state had approved that the defendant aided or abetted, agreed or attempted to aid another in the planning or commission of an offense. That would have been the robbery. Participated before or during the commission and had a concurrent specific intent to promote or facilitate. The intent aspect here is based primarily on the common design. Which basically is well known to the fact that two or more persons who engage in common criminal design or agreement, any acts committed in furtherance of that common design by one party are considered to be the acts of all parties to the design and the agreement are held equally responsible for the consequences of further acts. In this case, basically, the defendant was charged as an accomplice to the murder because of her agreement to commit the robbery. Basically, we have testimony evidence in this case that established through testimony of, yes, two people who were also involved in the crime itself, that this defendant agreed with the idea of robbing the individual. Did any of these individuals have the specific intent to kill Darlene Hunter? I don't think the evidence shows that. They did not have the specific intent to kill. No one had any intent to kill. They had the intent to rob. The problem is, in committing that robbery, they went too far. They beat Darlene Hunter about the head, slashed him, and as a result, he died of massive head injuries. In this case, this makes the defendant accountable for the death of Darlene Hunter because of her complicity with and her agreement to commit the robbery. How is that shown? Yes, Joshua Ward testified that the defendant was in the bedroom at the time the crime was hatched. Sylvia Enriquez says, no, the defendant was in the living room. Joshua Ward went out and explained what was going on. When she came back, she agreed. In fact, her testimony was her brother, Luis, said, you want to take and text him because you want to make sure you get him over here because you want to rob him. To which the defendant immediately started to take and text the defendant. Didn't she text him and say, do you want me to have somebody come and get him? No. Did she say that? No, she did not text that she wanted somebody to come and get him. What's going on with the text messages here and what the defendant wants this court to take in view is the fact that supposedly after the first sale was done, supposedly Darlene Hunter texted and wanted to know if everybody was happy with what they got. Coincidentally, that was after the plan to rob him had been hatched, been devised, and after it was decided that she would take and start texting to try to get him to do another sale, to come over. That was a convenient way for the defendants to be able to start texting. And did she say, oh no, it was bad, we want our money back, we didn't like, oh no, it was good, it was wonderful. By the way, we want to take and buy some more from you. At that point, if I'm not mistaken, that is when all this texting started going back about the price and about how much, et cetera, et cetera. During that conversation, once all the fine details of the sale were done, that's when Dahlia basically texts back and says, well, can you come and get it, because basically he didn't have a ride. Because, you know, DiBernardini was his transportation, was his taxi. That is when the defendant basically said, well, you know, that's when we came up with the excuse that, well, you know, my boyfriend is drunk, my girl is drunk and his girlfriend is drunk, et cetera, et cetera. And so, you know, want to take and do the deal, fine, if not, that's okay. Now, not wanting to take and press the issue, but again, not saying, I'll take and come and get it. If she makes an excuse, she wants to take and buy it, she wants to set the deal, but yet she won't go and get it. But yet she uses the excuse that her girl and his girlfriend are drunk. They can't come and get it. And regardless of whether there's truth to that or not, the fact of the matter remains what the whole purpose of the conversation was, was to get the deal, but to make sure that he came to her place. That was the whole import of everything. That was the whole purpose, was to get him there so they could rob him. And that is what the import of the text messages are all about. She played it well, she played it coy, very coy, and what she did is she was able to give him time to say, okay, fine, I'll take and come. He then got a hold of Dee Bernadini. She drove him over. She stayed out in the car. I do somewhat take issue with the fact of claiming that she is a disinterested eyewitness. Eyewitness to what? All she was is she simply sat in the car while the deal was made. She didn't know anything was going on until after everything happened. And to say that this shows that what happened is that it shows that the defendant was trying to take care of this individual, I think is not at all supported by the record. She wanted him out of her place. She was beside herself, not because of anything else. She was on housing. She was afraid that if this got out, she was going to lose her housing. She was concerned about herself. She did not care about the victim one iota. And in this particular case, her concern, I mean, basically, did she basically tell the individuals while they were beating him, while they were slashing him to stop? Did she call the police? Did she call an ambulance? No. What did she do? Hey, Josh, help me move my TV. I've got to get it out of the way so it doesn't get damaged. Does that sound like somebody who was really concerned about the victim? I think, based on the facts of this case, and considering the fact that these were two co-defendants who flipped, no different than a lot of other cases that this court has seen where a lot of the evidence is where defendants who have flipped. The question is, based on their testimony, and their testimony is consistent on all major points, irrespective of where she supposedly agreed, the fact is she none of us agreed. Her conduct that exhibited shows her agreement. The fact that it's hard to understand that I didn't intend for anybody to die, it's hard for people, it's hard for them to understand the accountability theory and the fact that they are accountable for those consequences, even though not intended originally. That's the problem here. And I think when you look at the facts as a whole, in this particular case, the evidence amply proves the defendant guilty beyond a reasonable doubt. Amply shows, amply satisfies the standard. Whether or not the evidence, when viewed in light most favorable to the prosecution, could any reasonable trier of fact define the elements beyond a reasonable doubt? Unequivocally, yes. With respect to the second issue, the people didn't confess error here because of this court's decision in Gashi. And basically my argument was based on Gashi. However, since then, this court has come out with Seve. And Seve, if I am not mistaken, I think I'm right, is from LaSalle County, and I think it involves Judge Mercurio as well, with basically the same questions, with the same everything. So it's rather difficult for me to take a stand here before the court and say, well, it's not error. Because the court has found these particular questions to be error. Indeed, 431B error has been committed here. But the problem is the fact that it was not objected to. As a result, plain error applies. The question now in Wisconsin, was the evidence closely balanced? I think on this record, using Bell Ant and using the fact that we have to use this common sense approach to the evidence, I think that clearly the evidence in this case is not at all closely balanced for purposes of plain error. As a result, the defendant is not entitled to a good trial. Defendant's conviction and sentence should be affirmed. If there are any questions, I'll be happy to address. Thank you very much, Your Honor. Thank you, Mr. Connery. Ms. Ware. Thank you, Your Honor. I just want to hit a couple of points. Counsel said that it was just a coincidence that Hunter text Lomeli first, and that was an opportune time for her to start texting back. But you have to think about the facts in the case. Joshua and Sylvia said that Lomeli was reading everything out loud. Okay? Lomeli never, they never testified that Lomeli said, hey, what do you know? He just texted me. This is perfect. Now let's get this going. You know? They said she's saying everything out loud, but they mention nothing about, you know, Hunter initiating the text messaging. So this is not a coincidence. This is because she's not involved in this plan. She knows nothing about their plan to rob the victim. Also, Your Honors, counsel said that the defendant was making excuses by saying that her boyfriend and her brother were drunk, you know, when she was texting the victim saying that she's not letting them go because they're drunk. But that's just a statement of the reality of the situation. Everybody at that house had been drinking all day. They had been doing cocaine, and that's a reasonable response, you know, for a friend not to let another friend to go drive in that condition. And so for the state to infer some kind of criminal intent or deceit from her making a truthful statement, that's unreasonable. They were drunk. Another point, the state said that the defendant was concerned about herself, and she didn't care about the defendant and all of that. Well, then why did she wrap up his head to stop the bleeding? Nobody else did that. Why did she go get him a cup of water? Nobody else did that. You know what I'm saying? At the time that she was helping him, she didn't know he was going to die. She didn't know she was going to have to defend herself against murder charges. She's just thinking, he just got beat up. He just got beat up by my brother and the friend. So she's helping him at that point because she does care about him. Nobody else did those things but her. And also, counsel said that Lomeli did not intervene. Yes, she did. She kicked everybody out of her house. Who knows how much longer that beating would have gone had she not said, get these two F's out of my house, get your boyfriend, get out. Joshua even testified that even after she said, get these two F's out of my house, that Jason and Lewis came back and hit him some more, even after she told them to leave. So there is evidence that the defendant tried to intervene. But what can she do? Three drunk felons fighting, she cannot physically stop them. She's doing what she can do to help her friend. Kicking them out, let's get them to the hospital. When did she call the police? She did not call the police. She did not call the police. Janelle DiBernardi called the police. Hunter didn't want Janelle to call the police. Lomeli didn't want them to call the police because they knew that they had done something wrong with this drug deal. And also, your honors, with respect to the second issue, this evidence is that legal. So she didn't want to call because of the drug deal. Right. That's a reasonable explanation because she definitely was involved in the drug deal. But she's not all that concerned about him. She's more concerned about herself. Well, she's concerned about him to the extent that she is trying to get him to the hospital. She tells Janelle, you know, to get him to the hospital. So she's trying to make a way for him to get help. She doesn't want the police to find out what actually happened, but she wants the victim to get help. She does not want him to die. And at the time, she didn't know that that's what was going to happen when she told Janelle to get him to the hospital. But it's not a question of whether she intends for him to die as a veteran. Right, but counsel said that she didn't care about him, that she didn't intervene. She didn't take any steps that showed she cared. And I'm just pointing out facts from the record that support the defense's theory that she did care, that they were friends, that she had no intent to rob. What is it that she's to care about? I mean, isn't it the intent to commit a robbery? Right. I mean, this is circumstantial evidence of her intent. Circumstantial evidence of, does she have the intent to rob? Does she have the intent to participate in this robbery? Isn't that quite a different thing than what you're trying to say, she didn't intend for him to die and all of that? That's not relevant, is it? Well, it's one of the... The fact is, it's an objective fact. He died during the commission of a felony that she was participating in, and there has to be an intent to further aid and abet that felony called robbery, not murder. Right. But she had no intent to participate in the robbery because of the fact that this is her friend who she cares about. She has no intent to participate in the robbery because of those facts. She doesn't want somebody that she cares about or is a friend to her to be robbed. And for these reasons and the reasons stated in my briefs, I'd ask this court to reverse the defendant's conviction pursuant to argument one or remand for a new trial pursuant to argument two. Thank you very much. Thank you. Thank you both for your arguments here today. This matter will be taken under advisement and a written decision will be issued as soon as possible. Right now, we'll take a brief recess for payment change.